IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| COOPER LEGGETT; JERRELL POWE; GAVIN BATES; ANGIE MCCLELLAND; and COLBURN MCCLELLAND | PLAINTIFFS |
| vs. | CAUSE NO.: 3:24-CV-670-KHJ-MTP |
| CITY OF RIDGELAND, MISSISSIPPI; DETECTIVE AUSTIN BANEY; PROSECUTOR BOTY MCDONALD; and JOHN DOES 1-25 | DEFENDANTS |

## COMPLAINT

**COME NOW**, the Plaintiffs, Cooper Leggett, Jerrell Powe, Gavin Bates, Colburn McClelland, and Angie McClelland, by and through their attorneys, and file this their Complaint against Defendants, City of Ridgeland, Mississippi, Detective Austin Baney, Prosecutor Boty McDonald; and John Does 1-25. In support thereof, Plaintiffs would show as follows:

### PARTIES

1. Plaintiff, Cooper Leggett ("Leggett"), is an adult resident of Wayne County, Mississippi.

2. Plaintiff, Jerrell Powe ("Powe"), is an adult resident of Forrest County, Mississippi.

3. Plaintiff, Gavin Bates ("Bates"), is an adult resident of Placer County, California.

4. Plaintiff, Colburn McClelland ("Colburn"), is an adult resident of Austin County, Texas.

5. Plaintiff, Angie McClelland ("Angie"), is an adult resident of Austin County, Texas.

6. Defendant, City of Ridgeland, Mississippi ("Ridgeland"), is governmental entity, that can be served process through its Clerk, Paula Tierce, at 100 West School Street, Ridgeland, Mississippi 39157, or its Mayor, Gene F. McGee, at 100 West School Street, Ridgeland, Mississippi 39157. Ridgeland is sued because of the official policy decisions and customs of the Ridgeland, Mississippi Police Chief, who may be the official policymaker for the City of Ridgeland Police Department.

7. Defendant, Detective Austin Baney ("Baney"), is an adult resident of Madison County, Mississippi. Defendant Baney is a Police Detective with the City of Ridgeland that upon information and belief was given policy making authority by the Chief of Police.

8. Defendant, Prosecutor Boty McDonald ("McDonald"), is an adult resident of Madison County, Mississippi. Defendant McDonald is a Prosecutor with the City of Ridgeland that was involved in the policy making decisions to prosecute Plaintiffs.

9. John Does 1 through 25 are the persons or entities, whether singular or plural, who or which caused or contributed to Plaintiffs' injuries, damages, and losses. Plaintiffs aver the identities of the John Doe Defendants are unknown, or if their names are known to Plaintiffs, their identities as proper parties are not known to Plaintiffs at this time and their true names will be substituted by amendment under the Federal Rules of Civil Procedure when ascertained.

## JURISDICTION AND VENUE

10. This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343 because Plaintiffs assert claims arising under the laws of the United States including 42 U.S.C. §§ 1983 and 1985 and the Fourth Amendment of the United States Constitution. This Court has supplemental jurisdiction over Plaintiffs' claims arising under state law under 28 U.S.C. § 1367(a),

because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

11. Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendants reside in this district and all incidents, events, and occurrences giving rise to this action occurred in this district.

12. All conditions precedent to the maintenance of this action, including those set forth in Mississippi Code Ann. § 11-46-11, have been performed or have occurred prior to filing.

13. Plaintiffs demand a jury trial for the Section 1983 and 1985 claims raised as is their right under Rule 38 of the Federal Rules of Civil Procedure.

## FACTS

14. This cause of action arises out of the malicious prosecution of Plaintiffs for kidnapping charges that were asserted against Plaintiffs by Defendants.

### a. *History of the Relationship with the Alleged Victim – Bryce Mathis*

15. Bryce Mathis ("Mathis") planned to launch a medical marijuana business in Mississippi.

16. Mathis employed Angie as the Chief Executive Officer of Endless Holdings, Inc. on or about August 31, 2022.

17. With a CEO and a company moving to capitalize on the legalization of medical marijuana in Mississippi, Bates and Powe became involved in different capacities with Mathis to further the endeavor.

18. With the assistance of Powe, Angie, and Colburn, approximately $300,000 was obtained from private investors to financially support the medical marijuana business Mathis was organizing in Mississippi.

19.     Powe had travelled with Mathis to Los Angeles, California, Las Vegas, Nevada, and several other places throughout Mississippi conducting business, which included accompanying Mathis at various banks to obtain cashier's checks to pay debts to move the business venture forward.

20.     Leggett was not involved in the medical marijuana business like the other Plaintiffs, but instead, he was the Board of Supervisors Attorney for Wayne County, Mississippi where Mathis lived. Mathis had worked with Wayne County to construct a facility for a similar business, and thereby Leggett, as the Board Attorney. Upon information and belief, the separate project Mathis had to construct a facility in Wayne County, Mississippi was abandoned when Mathis allegedly failed to pay the contractors for the initial dirt work. Leggett had nothing to do with Mathis' project with Powe, Bates, Colburn, and Angie.

b.    *__Financial Concerns Prompting Investigation Into the Finances__*

21.     Things were not going well with the startup of the medical marijuana business Mathis was attempting to have with Powe, Bates, Colburn, and Angie in Mississippi. With there appearing to be financial issues and unkept business arrangements for a facility, Angie, as the CEO, reasonably believed she needed to protect the interests of the investors, and therefore, she requested to review the business account at Chase Bank where the investors' money had allegedly been deposited.

22.     On January 6, 2023, Mathis agreed to add Angie to the bank account, but she was in Florida on other business. Nevertheless, she planned to go to the Chase Bank branch in Bradenton, Florida and called that branch to inquire what information she would need to access the account. At the same time, Mathis was contacting the Chase Bank to grant Angie access to the account.

4

23. Suspiciously, Mathis would not provide Angie with the account number, and he ceased contact with her for the remainder of the day. This concerned Angie, so she reached out to Powe, who contacted Mathis' father to obtain more information about Mathis and his other dealings.

24. Powe reported to Angie what he had learned, and Bates and Angie decided to meet with Mathis in Mississippi the following week to further evaluate the viability of conducting further business with Mathis in Mississippi.

25. By January 7, 2023, Mathis explained he had cancer and was overwhelmed with his other business in Texas to explain why he had not been able to have things ready in Mississippi for the planned medical marijuana business. However, Mathis and Angie still planned to meet in Mississippi with Mathis the following week to sort out the details concerning a facility for the business, the Chase Bank account, and the money the investors had provided.

    c.    ***Mississippi Meeting between Mathis, Angie, Bates, and Powe***

26. On January 9, 2023, Bates and Angie met at the New Orleans airport, and Bates rented a Tesla to drive with Angie to Mississippi to meet Mathis for a scheduled meeting which had been previously agreed to by Bates, Angie, and Mathis.

27. The parties met in Quitman, Mississippi to look at a facility, and with Mathis' approval, Angie reached an agreement to purchase the building to move the business forward.

28. After that, Powe, Angie, Bates, and Mathis met at Buffalo Wild Wings in Laurel, Mississippi, and after dinner, Angie, Powe, and Mathis began discussing the Chase Bank account where the investors' money was allegedly deposited.

29. Colburn joined the conversation by phone and asked Mathis to show the account to Angie. Mathis refused, claiming he did not have access to the account and did not know the account number.

30. During the meeting at Buffalo Wild Wings, suspicions deepened, and Colburn, via telephone, demanded that Mathis provide Angie with the licensing information which was required to begin the medical marijuana business. Upon Colburn's demand, Mathis explained he did not have the licenses, nor had he submitted the applications to obtain those licenses.

### d. *Demand for the Return of the Investors' Money*

31. With the revelations that Mathis did not have the licenses and had not even begun to submit the applications, Angie became uncomfortable with the situation and demanded that Mathis return the $300,000 he had been given by various private investors.

32. Mathis claimed he was scheduled for surgery on January 10, 2023, and therefore, this matter would need to wait until Wednesday, January 11, 2023. Angie and the others agreed, and Angie and Bates decided to stay in Mississippi until Wednesday.

33. In the interim, Powe continued investigating Mathis' previous business deals in Wayne County, Mississippi and contacted Leggett about it. Leggett confirmed Mathis' deal in Wayne County fell through due to lack of payment.

34. Powe discovered Mathis had allegedly taken money from others with some being paid back and others not. Such only caused further concern for the business Angie, Bates, Powe, and Colburn were trying to conduct with Mathis.

35. On Wednesday, January 11, 2023, Angie and Bates met, went to a flower shop, purchased a cake, and headed to Mathis' house to greet him after his surgery, and when they arrived at his house, they saw Mathis standing outside speaking with his father.

36. Angie and Bates were suspicious about whether Mathis had surgery the day before since he was outside seemingly unfazed by a recent surgery, and Angie gave the cake to Mathis' wife. As Angie, Bates, and Mathis continued their conversations about the investors' money, Angie again requested to review the Chase Bank account. With Mathis continuing to resist her requests and the information she had learned from Powe, Angie decided it was her fiduciary responsibility to return the investors' money and requested Mathis to obtain cashier's checks from the Chase Bank.

37. Mathis agreed, and Angie and Bates headed to the Chase Bank in Ridgeland, Mississippi with Mathis leaving on his own accord in the Tesla because Mathis did not have a vehicle. However, the parties had to return to Mathis' house after driving for 15 minutes because Mathis forgot his driver's license that he claimed he needed to access the Chase Bank account. After retrieving his license, Mathis got back into the front seat of the Tesla, and again, voluntarily left with Angie and Bates to go to the Chase Bank with Mathis telling them which route to take to Ridgeland, Mississippi.

    e.    *<u>Stop in Laurel, Mississippi</u>*

38. Mathis directed Bates to head towards Laurel, Mississippi, and during the trip, Angie did not feel well and was unsure whether she could continue the trip to the Chase Bank in Ridgeland, Mississippi.

39. Angie called Colburn, and he contacted Powe, who agreed to meet the group in Laurel, Mississippi to continue the trip to the Chase Bank in Angie's stead since she was not feeling well.

40. Powe met Mathis, Angie, and Bates in Laurel, Mississippi at the Wells Pharmacy. The group stopped at the pharmacy because Angie needed to use the restroom, and she wanted to get some medicine since she was not feeling well.

41. Since Angie was not feeling well, she did not continue the trip with Bates and Mathis to the Chase Bank.

42. Before Bates, Powe, and Mathis left for Ridgeland, Bubba Perry, one of Mathis' friends, arrived and attempted to give Angie and Bates jars of pickles. While a nice gesture, Angie refused and was suspicious as to why Mr. Perry had arrived at the Wells Pharmacy. Nevertheless, the conversation began about who was going to continue the trip to Chase Bank.

43. The group decided Angie would take Powe's car back to Hattiesburg while Mathis, Bates and Powe went to the Chase Bank in Ridgeland, Mississippi so that Mathis could obtain the account information and the cashier's checks to return the investor's money as he had agreed to do previously. Again, Mathis left with Powe and Bates voluntarily without asking to leave or asking to ride with Mr. Perry.

    *f.*    ***Trip to the Chase Bank in Ridgeland, Mississippi***

44. Powe and Bates were suspicious of Mathis' behavior during the trip, and therefore, the conversations inside the Tesla to Ridgeland, Mississippi were recorded.

45. As the trio headed to the Chase Bank in Ridgeland, Mississippi, it became apparent that they were not going to make it before the Chase Bank closed.

46. The trio made a couple of stops where they stopped to get food and use the restroom, and then, they stopped again at the Hampton Inn in Pearl, Mississippi for the night. Mathis voluntarily stayed with Powe and Bates and never asked to leave or had any reservations about going to the Chase Bank to retrieve the investors' funds.

47. The next morning, Thursday, January 12, 2023, Mathis called the Chase Bank in Ridgeland, Mississippi, seeking an appointment with his banker.

48. Mathis made another phone call to one of his associates, Andy Olear, and Powe recorded this call from the back seat of the Tesla.

49. After the phone call with Mr. Olear, Mathis explained he may not be able to get the money from the Chase Bank, but he would be willing to try since he had the account number.

50. While Bates, Powe, and Mathis were in route to the Chase Bank, Colburn called Powe, who placed the call on speaker, and Colburn asked Mathis if he could get cashier's checks so Angie could return the money to the investors. Mathis replied that he would get the cashier's checks to return the investors' money.

51. Mathis provided an elaborate story about how Mr. Olear would harm his family if he withdrew the money from the Chase Bank account. Colburn, Powe, and Bates assured Mathis they would take him to the Jackson, Mississippi FBI office immediately after going to the Chase Bank to report the issues and concerns regarding his fear of Mr. Olear.

52. Thereafter, Mathis, Bates, and Powe headed to the Chase Bank in Ridgeland, Mississippi with Mathis agreeing to go voluntarily with Bates and Powe.

   g. *The Chase Bank in Ridgeland, Mississippi*

53. Upon arriving at the Chase Bank, the trio exited the Tesla, and Powe and Mathis entered the Chase Bank together. Bates stayed outside and was on the phone with Angie.

54. A bank employee, Jackson Sharpe, greeted Mathis and Powe sat in the lobby while Mathis waited for an available teller.

55. Mathis communicated with the teller, and then, Mathis was taken to another office where he began speaking with a different bank employee.

### h.    *Arrival of the Ridgeland Police Department*

56.    Not long after Mathis met with that bank employee, the Ridgeland Police Department arrived, asking whether someone had called the police.

57.    Powe was confronted by an unknown Ridgeland Police Officer and asked to step out of the Chase Bank at which point he was informed he was being arrested for kidnapping Mathis.

58.    Bates was also approached by an unknown Ridgeland Police Officer and was informed he was being arrested for kidnapping Mathis too.

59.    Upon information and belief, the Ridgeland Police Department took possession of and reviewed the contents of Powe's cell phone and Bates' cell phone, including but not limited to their text messages, videos, and audio notes.

60.    Powe and Bates were taken to the Ridgeland Police Department for processing, and upon information and belief, the Ridgeland Police Department, Baney, and McDonald had the information to show a kidnapping had not occurred because Mathis had made the trip voluntarily to retrieve the investors' money in the failed business venture.

### i.    *Fallout after the arrests of Powe and Bates*

61.    After the arrests of Powe and Bates, Baney signed affidavits for warrants for Angie, Colburn, and Leggett where each were charged with kidnapping and conspiracy to kidnap Mathis to leverage funds from his bank account. The affidavits are devoid of corroborating facts and demonstrate, upon information and reasonable belief, that Baney, McDonald, and others from the Ridgeland Police Department either withheld or ignored key facts to demonstrate Mathis voluntarily elected to travel with Powe and Bates to the Chase Bank in Ridgeland, Mississippi.

62.     News of the arrests hit the local and national media due to Powe being a former professional football player, and McDonald announced to the media that he had written communications to prove Powe, Bates, Leggett, Colburn, and Angie had committed felonies in attempting to secure the investors' money from Mathis. However, McDonald's statements ignored the evidence he and the Ridgeland Police Department had to show Mathis' kidnapping story was a façade to evade returning the money to his investors on the failed business venture.

63.     In other statements provided to the media, McDonald falsely claimed Mathis had been kidnapped by Powe's brute strength even though Powe was never with the original trio when Mathis voluntarily left his home in Waynesboro, Mississippi.

64.     McDonald gave numerous other statements to the media that the backbone of the kidnapping charges against Powe, Bates, Leggett, Colburn, and Angie came from what the group said, typed, and texted, but none of these recordings, messages, or texts contained any information to show or establish Mathis was forcibly taken or held against his will.

65.     Later, Leggett was arrested by the US Marshalls and taken to the Madison County detention center until he posted bond and was released. Angie was arrested by the US Marshalls also at her home in Texas and Colburn turned himself into the Ridgeland Police Department where he was booked and processed. Both Angie and Colburn posted bond and were released.

66.     At least one other agency that investigated the incident, the Laurel Police Department, determined Mathis had not been kidnapped, and instead, left Laurel, Mississippi with Powe and Bates voluntarily.

67.     Upon information and belief, Defendants possessed sufficient information to demonstrate Mathis had not been kidnapped and there was no conspiracy to do so either. At all

times, Angie, Colburn, Bates, and Powe understood and reasonably believed Mathis was going to the Chase Bank in Ridgeland, Mississippi voluntarily to return the investors' money.

### j. *The Prosecution of Plaintiffs*

68. Once the matter was turned over to Madison County District Attorney's Office for the felony prosecution of Powe, Bates, Leggett, Colburn, and Angie, a "no true bill" was entered on November 30, 2023, for Plaintiffs. Afterwards, the failure to indict hit the media again, and McDonald stated he stood behind the work of his office and the Ridgeland Police Department.

69. While Powe, Bates, Leggett, Colburn, and Angie were not indicted for the felony kidnapping and conspiracy charges, each suffered individual damages including loss of employment, damage to their reputations, negative impact on their business dealings, mental anguish, emotional distress, inconvenience, and various out-of-pocket expenses, including but not limited to attorneys' fees and other costs in defending themselves against the felony charges pursued by Defendants.

70. Baney and McDonald are liable to Plaintiffs because Baney and McDonald maliciously caused Plaintiffs to be wrongfully arrested, prosecuted, imprisoned, and post large bail amounts without the requisite information to factually support the charges against Plaintiffs.

71. Ridgeland is liable, along with Baney and McDonald, for the wrongful arrest, confinement, and malicious prosecution because Ridgeland, through its official policymakers, consisting of the Chief of Police and/or other Ridgeland city officials, had been willfully indifferent to the rights of Plaintiffs by failing to train officers that they could not cause an arrest and imprisonment of a person without reliable evidence indicating a crime had been committed and without disclosing complete and accurate information to the municipal judge issuing the warrants for the arrests.

72. Upon information and belief, Ridgeland's Chief of Police and/or other Ridgeland city officials delegated to Baney and McDonald full authority over the investigation and prosecution, and thus, allowing Baney and McDonald to become the official policymakers for Ridgeland when performing the investigation and prosecution to make the decision to arrest, confine, and maliciously prosecute Plaintiffs without sufficient evidence to support the kidnapping charges asserted. If Ridgeland's Chief of Police and/or other Ridgeland city officials delegated the unsupervised arrest authority and prosecution authority to Baney and McDonald, then Ridgeland is liable for the Chief's and/or other Ridgeland city officials' official police actions taken in violation of the Fourth and Fourteenth Amendments.

## CAUSES OF ACTION

### COUNT I – 42 U.S.C. § 1983: ABUSE OF EXECUTIVE POWER

73. Plaintiffs incorporate by reference the preceding paragraphs as fully set forth herein.

74. Plaintiffs enjoyed a right to be free from unlawful seizures clearly established and protected by the Fourth and Fourteenth Amendments to the United States Constitution.

75. Upon information and belief, Baney and McDonald were acting under the color of state law and were cloaked with the authority given to them by the Chief of Police for Ridgeland and/or other Ridgeland city officials.

76. While acting under the color of state law, Baney and McDonald, using their executive power, arranged for Plaintiffs to be arrested, confined, and prosecuted without legal authority or justification and withheld information relevant to whether Plaintiffs should have been charged with a crime.

77. Baney's and McDonald's conduct rose above the "conscious shocking" level, because they arranged for Plaintiffs to be charged, arrested, confined, and prosecuted without sufficient evidence and probable cause that Plaintiffs kidnapped Mathis or conspired to kidnap Mathis.

78. Plaintiffs could not have been charged, arrested, confined, and prosecuted without Baney's and McDonald's concerted, deliberate and intentional abuse of executive power, which led to Plaintiffs being maliciously prosecuted for crimes they did not commit.

79. As a result, Plaintiffs' substantive due process rights were violated, causing damages for which Defendants are responsible.

## COUNT II – 42 U.S.C. § 1983: MALICIOUS PROSECUTION

80. Plaintiffs incorporate by reference the preceding paragraphs as fully set forth herein.

81. Plaintiffs enjoyed a right to be free from malicious prosecution clearly established and protected by the Fourth and Fourteenth Amendments to the United States Constitution.

82. Upon information and belief, Plaintiffs were acting under the color of state law and were cloaked with the authority given to them by the Chief of Police for Ridgeland and/or other Ridgeland city officials.

83. While acting under the color of state law, Baney and McDonald using their authority, arranged for Plaintiffs to be maliciously prosecuted and maliciously arrested without probable cause, in violation of the Fourth and Fourteenth Amendments and in violation of state law.

84. Upon information and belief, Baney and McDonald had actual knowledge of Plaintiffs' innocence but were deliberately indifferent to Plaintiffs' rights under the Fourth and

Fourteenth Amendments. Ultimately, Plaintiffs received a "no true bill" from the Madison County Grand Jury, and the prosecution against Plaintiffs ended favorably.

85. As a proximate result Baney's and McDonald's deliberate and intentional conduct, Plaintiffs' substantive due process rights were violated, causing damages for which Defendants are responsible.

## COUNT III - CLAIMS MADE UNDER THE MISSISSIPPI TORT CLAIMS ACT FOR GROSS NEGLIGENCE AND MALICIOUS PROSECUTION

86. Plaintiffs incorporate by reference the preceding paragraphs though fully set forth herein.

87. Mississippi Code Ann. Section 11-46-5(1) waives immunity of the state and its political subdivisions from claims for money damages arising out of the torts of such governmental entities and the torts of their employees while acting within the course and scope of their employment.

88. Ridgeland is a "political subdivision" within the meaning of Section 11-46-1(i) of the Mississippi Tort Claims Act.

89. Baney and McDonald are "employees" of Ridgeland within the meaning of Section 11-46-1(f) of the Mississippi Tort Claims Act.

90. Defendants owed a duty of care to Plaintiffs to have probable cause and not omit key facts to maliciously prosecute Plaintiffs in violations of their rights through the proper enforcement of Mississippi law and the Mississippi Constitution.

91. Under Mississippi Code Ann. Section 11-46-9(1)(c), Ridgeland is liable to Plaintiffs for the acts and/or omissions of Baney and McDonald, who were engaged in the performance or execution of duties or activities relating to the arrest, confinement, and malicious prosecution of Plaintiffs without probable cause.

92. Baney's and McDonald's actions violated well-established law, and said actions were taken in reckless disregard of Plaintiffs' rights constituting gross negligence because Baney and McDonald omitted and/or ignored evidence that demonstrated Plaintiffs had not kidnapped nor conspired to kidnap Mathis.

93. Baney and McDonald knew or should have known probable cause to prosecute Plaintiffs was lacking because there was no identifiable evidence to demonstrate Plaintiffs had forcibly taken Mathis or held him against his will at any time prior to the arrival of the Ridgeland Police Department at the Chase Bank in Ridgeland, Mississippi.

94. Before the commencement of this action, the kidnapping and conspiracy charges against Plaintiffs were judicially investigated by the Grand Jury, the prosecution ended, and the Plaintiffs received a "no true bill" on November 30, 2023, discharging all charges against them favorably.

95. Plaintiffs' injuries, damages, and losses were directly and proximately caused by the Defendants' collective failures that were deliberately indifferent to Plaintiffs' rights to be free from unlawful seizure and malicious prosecution without probable cause. Therefore, Defendants are liable to Plaintiffs for the resulting injuries, damages and losses.

## DAMAGES

96. Plaintiffs incorporate by reference the preceding paragraphs as fully set forth herein.

97. As a proximate consequence, or proximate contributing consequence, of the above-described acts of the Defendants, Plaintiffs have suffered and sustained injuries, damages, and/or losses and damages, including, but not limited to:

   a. Loss of income, benefits and future earning capacity;

b. Damage to reputation;

c. Costs to restore reputation;

d. Costs to defend the kidnapping and conspiracy charges;

e. Inconvenience;

f. Mental anguish and emotional distress;

g. Attorneys' fees and the costs associated with this action under 42 U.S.C. § 1988;

h. Punitive damages for the reckless and callous disregard for the rights of Plaintiffs against the individual Defendants and in an amount to be determined at trial; and

i. Other injuries, losses and damages which may be shown at trial.

**WHEREFORE, PREMISES CONSIDERED**, the Plaintiffs demand judgment against the Defendants in an amount to be determined by a jury regarding Plaintiffs' federal law claims and by the judge with regard to Plaintiffs' state law claims in an amount reasonably calculated to fully compensate Plaintiffs for the resulting injuries, damages, and losses, as well as attorneys' fees and all costs of bringing this action.

Respectfully Submitted,

**COOPER LEGGETT, et al.**

By: /s/ *Thomas O. Cooley*
THOMAS O. COOLEY, MBN 103991
CASEY L. LOTT, MBN 101766
Attorneys for Plaintiffs

**LANGSTON & LOTT, PLLC**
100 South Main Street
Post Office Box 382
Booneville, Mississippi 38829
Telephone: (662) 728-9733
Facsimile: (662) 728-1992
Email: tcooley@langstonlott.com
       clott@langstonlott.com