UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

COOPER LEGGETT, et al.                                        PLAINTIFFS

V.                                    CIVIL ACTION NO. 3:24-CV-670-KHJ-RPM

CITY OF RIDGELAND, MISSISSIPPI,                              DEFENDANTS
et al.

ORDER

Before the Court are Defendants City of Ridgeland, Detective Austin Baney,

and Prosecutor Boty McDonald's (collectively "Defendants") [15] Motion for

Judgment on the Pleadings and [17] Motion for Summary Judgment. For the

reasons stated below, the Court grants the [17] Motion and denies the [15] Motion

as moot.

I.       Background

         A.  The Medical Marijuana Business

         This case is about a drug deal gone wrong. Soon after Mississippi legalized

medical marijuana in 2022,[1] five associates teamed up to launch a medical

marijuana business. Bryce Mathis ("Mathis") led the team. *See* Compl. [1] ¶¶ 15–18.

He recruited Jerrell Powe ("Powe")—fellow Mississippi native and hometown

acquaintance; Gavin Bates ("Bates")—a marijuana grower from California; and

---

[1] *See* Mississippi Medical Cannabis Act, Miss. Code Ann. §§ 41-137-1–41-137-67
(Rev. 2023).

Angie and Colburn McClelland ("Colburn")—a husband and wife duo from Texas. [1] ¶¶ 2–5, 15–18; Powe Interview [17-2] at 17:05.

Angie McClelland ("Angie") served as Chief Financial Officer, and she, Colburn, and Powe helped recruit investors. [1] ¶¶ 16, 18. Bates and Powe were "involved in different capacities . . . to further the endeavor." [1] ¶ 17. Together, the group raised around $300,000 to fund the dispensary business. [1] ¶ 18.

B. Relationships Sour

Within months of the initial funding, "[t]hings were not going well." [1] ¶ 21. Angie started to suspect "financial issues and unkept business arrangements," so she demanded Mathis give her access to the bank account where he had deposited the investors' money. [1] ¶ 21–23. Mathis refused, and Angie's suspicions deepened. [1] ¶ 23.

On January 9, 2023, Angie and the others confronted Mathis and demanded that he return the investors' money. [1] ¶ 28–31. Mathis was scheduled to have surgery the following morning, so he asked to put things on hold until January 11. [1] ¶ 32. The others agreed. *Id.*

In the meantime, Powe called Cooper Leggett ("Leggett"), a local lawyer and long-time acquaintance, to see what he knew about Mathis. [1] ¶¶ 33–34; [17-2] at 17:08; Leggett Interview [17-12] at 09:15, 09:37. Leggett knew Mathis through some prior (reportedly contentious) business dealings. Perry Interview [17-4] at 12:13; [17-12] at 09:25. Leggett shared with Powe and the others personal and financial

information about Mathis. [1] ¶ 33–34; [17-12] at 09:21-10:00; Leggett/Powe Texts [17-7] at 1.

C.  The Alleged Kidnapping

Powe's talk with Leggett only worsened the team's suspicions. [1] at ¶ 34. So on January 11—the day after Mathis's surgery—Angie and Bates went to Mathis's house, and Angie demanded again that Mathis return the investors' money. [1] ¶¶ 35–36. The three left Mathis's house together. [1] ¶ 37; Def.'s Mot. for Summ. J. Mem. [18] at 1–2.

There are two conflicting versions of what happened next. And those two stories are at the heart of this lawsuit. Plaintiffs' story is that Mathis agreed to go with Angie and Bates to Chase Bank several counties away in Ridgeland, Mississippi, where Mathis would return the investors' money. [1] ¶¶ 36–38. Plaintiffs say Angie got sick on the way to Ridgeland, Powe took her place in the car, and the three men—Mathis, Bates, and Powe—continued to the bank with Mathis's consent. [1] ¶¶ 39–43.

The other story—Mathis's story—is that Angie and Bates tricked him into getting in the car with them, that Powe ambushed and physically assaulted him, and that Powe and Bates forced him to the bank against his will. *See* Mathis Interview [17-1] at 10:08; 10:37; 10:58-11:05; 11:22.

In any event, after the men arrived at Chase Bank, Mathis told bank employees that he was being held against his will. *See* [1] ¶¶ 53–56; [17-1] at 10:37. Officers from the Ridgeland Police Department responded to the call. [1] ¶ 56.

Law enforcement found Mathis's story credible enough to support criminal charges. They arrested Powe and Bates immediately on suspicion of kidnapping. [1] ¶¶ 57–58. Within the next few weeks, all five Plaintiffs—Powe, Angie, Colburn, Bates, and Leggett—faced charges of conspiring to kidnap Mathis. *See* Arrest Warrants [17-3] at 1 (Bates); [17-8] at 1 (Powe); [17-9] at 3 (Colburn); [17-9] at 7 (Angie); [17-10] at 2 (Leggett).

### D.  The Grand Jury "No Bills" the Kidnapping Charges

The Madison County District Attorney's Office accepted the cases for felony prosecution and presented them to the Madison County Grand Jury. [1] ¶ 68. The grand jury found insufficient probable cause to indict Plaintiffs and returned a "no bill" on November 30, 2023. [1] ¶ 68; [18] at 4; *see* Miss. Code Ann. § 13-7-5 (to return a "true bill" of indictment, 12 or more grand jurors must find that probable cause exists for the indictment and vote in favor of the indictment).

### E.  This Lawsuit

Plaintiffs want vindication for what they see as baseless charges against them. They sued three defendants: Detective Austin Baney ("Detective Baney")—one of the detectives who investigated Mathis's kidnapping; Prosecutor Boty McDonald ("Prosecutor McDonald")—the prosecutor who presented Plaintiffs' cases to the grand jury; and the City of Ridgeland ("the City")—the governmental entity that employs Detective Baney and Prosecutor McDonald.

There are three claims before the Court.[2] Counts I and II allege Defendants are liable under Section 1983 for abuse of executive power and malicious prosecution. Count III alleges Detective Baney and Prosecutor McDonald also are liable for state law malicious prosecution. For the reasons explained below, the Court dismisses all three claims.

## II.    Standard

Defendants ask the Court to dismiss this case under Rule 12(c) or Rule 56 of the Federal Rules of Civil Procedure. Rule 12(c) Mot. [15]; Rule 56 Mot. [17]. The Court first decides which legal standard to apply.

Parties may file Rule 12(c) motions for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). Rule 12(c) motions are subject to the same legal standard as Rule 12(b)(6) motions to dismiss: The central issue is whether, construed liberally, the complaint states a valid claim for relief. *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008). Judgment under Rule 12(c) is appropriate "if there are no disputed issues of material fact and only questions of law remain." *Brittan Communications Intern. Corp. v. Sw. Bell Tel. Co.*, 313 F.3d 899, 904 (5th Cir. 2002). In making this determination, the Court looks only to the pleadings and their attachments, accepting all allegations as true. *Id.*; *Voest-Alpine Trading USA Corp. v. Bank of*

---

[2] At first, Plaintiffs claimed the City was also liable under state law for malicious prosecution, and that all three Defendants were liable under state law for gross negligence. [1] ¶¶ 73-95. They later conceded those claims. [25] at 42.

*China*, 142 F.3d 887, 891 n.4 (5th Cir. 1998) (acknowledging that district courts may consider attachments to pleadings when ruling on 12(c) motions).

The Court may also look beyond the pleadings to dismiss a case before trial. If it does so, "the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). And "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id.*

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it might affect the outcome of the lawsuit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if it is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* In essence the question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

Both parties have presented the Court with extensive materials outside the pleadings. *See* [15], [24]. And the Court finds that the parties have had a reasonable opportunity as required by Rule 12(d) to offer all material they think is pertinent to the pending dispositive motions. The Court, therefore, applies the summary judgment standard to Defendants' motions.

III.    Analysis

A. Section 1983 Claims

Plaintiffs allege Defendants are liable under Section 1983 for abuse of executive power and malicious prosecution. [1] ¶¶ 73–85. One missing thing dooms these claims from the start: Defendants did not violate Plaintiffs' constitutional rights. And, even if Plaintiffs had proven a constitutional harm, qualified immunity protects Detective Baney and Prosecutor McDonald, and the City avoids liability under *Monell*.

1. No Constitutional Violation

Plaintiffs' Section 1983 claims fail first because Defendants did not violate their constitutional rights.

To prevail under Section 1983, Plaintiffs must prove they suffered "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by a person acting "under color of [law]." *White v. Thomas*, 660 F.2d 680, 683 (5th Cir. 1981) (citing 42 U.S.C. § 1983). Plaintiffs claim Defendants arrested and prosecuted them without probable cause, and that—they say—is the constitutional violation that underlies this lawsuit. [1] ¶¶ 77, 83; [25] at 10–11 (detailing "[t]he constitutional violation" as "arrest and detention . . . based on criminal charges lacking probable cause"); [25] at 20 (disputing any characterization of their case as a *Franks* claim or a *Malley* claim).

The undisputed facts show that there was probable cause for Plaintiffs' arrests, though. So Plaintiffs suffered no constitutional harm, and their Section 1983 claims do not survive summary judgment. Furthermore, setting aside probable

7

cause, Plaintiffs' abuse of executive power claim misses the mark because Detective Baney and Prosecutor McDonald did not engage in egregious or outrageous conduct.

a.  Probable Cause

Begin with Plaintiffs' core theme—that Detective Baney and Prosecutor McDonald lacked probable cause to prosecute them for conspiring to kidnap Mathis.

The probable cause standard is well-settled; the Court looks to the "totality of the circumstances" to determine whether probable cause existed. *See Mendenhall v. Riser*, 213 F.3d 226, 231 (2000) (citing *Illinois v. Gates*, 462 U.S. 213, 241 (1983)). The probable cause inquiry is a mixed question of fact and law. *United States v. Levine*, 80 F.3d 129, 132 (5th Cir. 1996). But if the facts are undisputed, the ultimate question of probable cause is a question of law. *Id.* Examining probable cause requires the Court to undertake a "practical, common-sense determination." *Mendenhall*, 213 F.3d at 231.

Probable cause must be supported by more than mere suspicion, but it can stand on "considerably less than what is required for a conviction of guilt." *United States v. Bertram*, 719 F.2d 735, 738 (5th Cir. 1983). In the malicious prosecution context, the Court examines whether a prosecutor faced circumstances that would "excite the belief, in a reasonable mind, acting on the facts within the knowledge of the prosecutor, that the person charged was guilty of the crime for which he was prosecuted." *Gordy v. Burns*, 294 F.3d 722, 728 (5th Cir. 2002), *abrogated by Castellano v. Fragozo*, 352 F.3d 939 (5th Cir. 2003), *but see Espinal v. City of Houston*, 96 F.4th 741, 748 (5th Cir. 2004) (reinstating *Gordy* as good law after

*Thompson v. Clark*, 596 U.S. 36 (2002)). And the term "prosecutor" does not just mean the prosecuting attorney; it includes any person who initiates a criminal proceeding, including law enforcement officers like Detective Baney. *Gordy*, 294 F.3d at 728 (citation omitted). Simply put, this Court must decide whether, given the totality of the circumstances, Detective Baney and Prosecutor McDonald reasonably believed Plaintiffs conspired to kidnap Mathis.

Before answering that question, the Court dispenses with any argument that law enforcement lacked probable cause to arrest Bates and Powe at the bank. Probable cause for a warrantless arrest exists "when all of the facts known by a police officer are sufficient for a reasonable person to conclude that the suspect had committed, or was in the process of committing, an offense." *Loftin v. City of Prentiss*, 33 F.4th 774, 780 (5th Cir. 2022) (citation modified). Police initially arrested Bates and Powe for kidnapping, which occurs when any person "without lawful authority and with or without intent to secretly confine, forcibly seizes and confines any other person," or "inveigles or kidnaps any other person with intent to cause such person to be confined or imprisoned against his or her will . . .." *See* Miss. Code Ann. § 97-3-53. So the question is whether the officers who responded to the bank reasonably believed Bates and Powe had kidnapped Mathis. They did.

Officers responded to Chase Bank after bank employees reported that Mathis was being held against his will. *See* McGahey Aff. [17-11] at 81; McGahey Aff. [24-11] at 5. Mathis told officers that he had gotten into the car with Bates believing they were going to lunch, and that Bates and Powe had forced him to go to the bank

instead. *Id.* Mathis said Powe forbid him to leave and Bates guarded him to prevent his escape. *Id.* Police examined all three men's cell phones and took statements from bank personnel, which they found lent credibility to Mathis's version of the events. *Id.* Relying on these allegations, law enforcement arrested Bates and Powe without a warrant for kidnapping. *Id.* In the Court's view, these circumstances easily established probable cause for Bates's and Powe's initial arrests.[3]

Turn then to whether Detective Baney and Prosecutor McDonald had probable cause for the charges they brought later—that all five Plaintiffs had conspired to kidnap Mathis. Under Mississippi law, conspiracy to kidnap involves "any implied or express agreement" to commit kidnapping. *See* Miss. Code Ann. § 97-1-1; *Magee v. State*, 349 So. 3d 734, 753 (Miss. Ct. App. 2022). So, like before, the question is whether Detective Baney and Prosecutor McDonald reasonably believed Plaintiffs had conspired to kidnap Mathis. Again, they did.

In the weeks after the alleged kidnapping, Detective Baney uncovered the following evidence:

- Leggett surveilled Mathis before the kidnapping. He told the other Plaintiffs about Mathis's prior business dealings and gave them information about Mathis's whereabouts, including where Mathis might have received medical care. Leggett sought out and shared information about Mathis's children's school and their schedules. *See* [1] ¶¶ 33–34; [17-2] at 10:03–10:13, 17:08; [17-7] at 1–9; [17-12] at 09:15, 09:37–10:09.

---

[3] Police also arrested Bates for unlawfully possessing marijuana. *See* Bates Arrest Records [17-3] at 5. This further undermines his probable cause dispute. *Voss v. Goode*, 954 F.3d 234, 238 (5th Cir. 2020) (acknowledging that law enforcement may justify an arrest by showing probable cause for any crime).

- Angie, Colburn, and Powe planned for Powe—a former professional football player—to intimidate Mathis into returning the investors' money. *See* [1] ¶ 62; Angie/Colburn/Powe Texts [24-5] at 3–4 (indicating that Powe refrained from "slap[ping] the hell out of Bryce," that Angie concealed from Mathis that Powe was coming to a meeting, and that Colburn demanded Mathis have "no wiggle room").

- On the day of the kidnapping, Bates told Mathis that he and Angie "might swing by [Mathis's home] to say hey." Bates did not discuss going to Chase Bank. *See* Foxgate Recording [17-8].

- Angie and Bates visited Mathis's home. Mathis, Angie, and Bates left Mathis's home together. *See* [17-1] at 10:08; [17-4] at 11:17, 11:21. Angie texted Powe and Colburn that "Bryce is in the car and we are on the way to Chase bank in Ridgeland. He is a LIAR . . .." [24-5] at 5.

- Angie, Colburn, and Powe planned to surprise Mathis with Powe's presence at the bank. *See* [24-5] at 5–6 (Colburn instructed Powe to "meet them at the bank but wait til they get inside to show up" and to "get [Mathis] trapped inside the bank"; Angie reported that Mathis was "very nervous looking everywhere for a car following [them].")

- Angie, Colburn, and Powe decided that Powe would intercept the group in Laurel instead of Ridgeland. Angie reported that Mathis "now wants out." Powe instructed that Angie "snatch his phone" and "Dnt let him out." *See* [24-5] at 7–8. Colburn texted "It's very telling that Bryce does not want to go to the bank." [24-5] at 9.

- After Powe took Angie's place on the drive, the group stopped at a hotel for the night. Mathis told police Powe guarded him. [17-1] at 10:28.

- Bates drove the vehicle and was present throughout the alleged kidnapping. Mathis told police that Bates used evasive driving maneuvers to elude Bubba Perry, a friend Mathis called after Powe's unexpected arrival made him uneasy. *See* [17-1] at 10:10–10:16, 11:06, 11:26; [17-4] at 11:17–11:22.

- Colburn's text messages corroborated Mathis's allegation that he was held against his will. *See* [24-5] at 11–12 (Colburn texting "DO NOT LET BRYCE UP FOR AIR" and "we will never get him cornered again like we have now" and that Mathis was "looking for a way to get out of this trap today.")

11

- Mathis told law enforcement Powe and Bates had taken his cell phones and sent text messages purporting to be from Mathis. [17-1] at 10:16; 10:31. Plaintiffs' text messages corroborated this allegation. *See* [24-5] at 5, 7 (Powe texted "take his phone" and "snatch his phone"); [24-5] at 12–13 (Angie texted "he does not need his phone" and asked if Mathis's location was enabled on his phone; Powe confirmed "location is off"); [24-5] at 18 (Colburn asked, "Bryce doesn't have his phone does he?" Powe responded, "No No No" and "I got his phone"). Additionally, Mathis's friend, Bubba Perry, told police that he received strange texts from Mathis's phone that he suspected were not from Mathis. *See* [17-4] at 11:26–11:28, 12:29.

- Text messages between Mathis and his wife corroborated Mathis's version of events. *See* [24-13] at 3 (Mathis's wife asked, "Why did you go?" Mathis responded, "I didn't have a choice.").

- Mathis believed his family was in danger. [17-1] at 10:05; 10:22; 10:28; 10:34; 11:12.

- Mathis reported that Powe physically and verbally assaulted him. [17-1] at 10:14, 11:27. Mathis reported that Powe would not let him leave. [17-1] at 10:23.

- Mathis reported that Colburn threatened to kill him if he tried to run. [17-1] at 10:21, 10:28.

- Powe communicated with Leggett throughout the alleged kidnapping, even video calling him from inside the bank. [17-2] at 09:45–10:03; [17-7]; [24-12] at 3. And right before police took Powe into custody, Angie mentioned Leggett's name as a person to call for help. [17-12] at 10:13; [24-6] at 83; [24-12] at 3. Angie called Leggett after police arrested Bates and Powe. [17-2] at 10:01. Powe told police that he and his colleagues were "in cahoots" with Leggett. [17-2] at 17:08; [24-12] at 3.

Given the evidence corroborating Mathis's story, viewed beside probable cause's low bar, the Court cannot say Detective Baney and Prosecutor McDonald were unreasonable to believe Plaintiffs were guilty of conspiracy. *See District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) ("Considering the totality of the circumstances, the officers made an entirely reasonable inference [that defendants

were committing a crime].") Accordingly, the Court finds there was sufficient probable cause to support the prosecutions. And it does not matter that the grand jury ultimately decided not to indict Plaintiffs. *See Raimey v. Gipson*, Case No. 3:23-CV-458-DMB-RP, 2024 WL 4326816, at * 5 (N.D. Miss. Sept. 27, 2024) ("[J]ust because a prosecution ends favorably for an accused does not necessarily mean there was no probable cause for its initiation.")

Plaintiffs disagree. They say probable cause was lacking because "Defendants had the information to show a kidnapping had not occurred because Mathis made the trip [to the bank] voluntarily" and "Defendants ignored key facts to demonstrate Mathis voluntarily elected to travel with Powe and Gavin [to the bank]." [25] at 10. Said more plainly, Plaintiffs think probable cause was negated by *any* evidence—no matter how disputed—that Mathis consented to the bank trip. Not so.

For starters, the Fifth Circuit "has repeatedly refused to opine on whether facts supporting the existence of an affirmative defense are relevant to the determination of probable cause." *Loftin*. 33 F.4th at 780 n.2 (citation modified). "And because probable cause poses a low bar, courts that deem affirmative defenses relevant require their application to be 'conclusive' to vitiate probable cause." *Espinal*, 96 F.4th at 747 (citation modified).

Plaintiffs' supposed defense—that Mathis consented to the bank trip—was far from conclusive. *See id.* To be sure, Plaintiffs and Mathis had different stories about how Mathis wound up at the bank. And there was some evidence to support Plaintiffs' version of the events. *See, e.g.*, [17-2] at 17:29 (Powe told police Mathis

voluntarily surrendered his phones), [17-2] at 17:43 (Powe denied physically assaulting Mathis); [24-5] at 14 (Colburn texted "[i]f Bryce has asked to leave we gotta let him go . . . so long that he is staying by his own choice, there is no issue" to which Powe responded "[h]e ain't [] asked to leave at all."); [24-13] at 16 (Mathis's phone showed a text to his wife that he "suggested we go ahead and come up here so that we could get it handled first thing in the morning."). While this evidence might have caused Detective Baney and Prosecutor McDonald to question the truth of Mathis's story, it was not conclusive enough to vitiate probable cause.[4]

To begin, much of the evidence contradicting Mathis's story came from Powe—one of the suspects. Powe's declarations of innocence did not negate probable cause. *See Loftin*, 33 F.4th at 781 ("[A] soon-to-be arrestee's naked assertion of [a defense] does not vitiate probable cause.") Even more, Detective Baney and Prosecutor McDonald would have rightly questioned whether any texts on Mathis's phone—including the one to his wife saying he wanted to go to the bank—were authentic. Mathis told Detective Baney that Powe took his phones, forced him to send texts, and even sent some texts posing as Mathis. *See* [17-1] at 10:16, 10:25, 10:30, 10:33. Mathis's friend, Perry, lent credibility to these allegations. *See* [17-4] at 11:24 (describing how he received "very strange" messages from Mathis). So,

---

[4] This argument has another flaw. Mathis's consent (or not) to the bank trip might have impacted Powe's and Bates's kidnapping charges, but it would be irrelevant to Plaintiffs' conspiracy charges. *See United States v. Jasso*, 442 F.2d 1054, 1056 (5th Cir. 1971) ("A conspiracy conviction does not require the commission of any completed substantive offense."); *Lee v. State of Mississippi*, 756 So. 2d 744, 746 (Miss. 1999) ("A criminal conspiracy is complete upon the combination, and the law does not require proof of an overt act in pursuance thereof.").

while the Court agrees there was some evidence Mathis consented to the bank trip, it is far from the slam-dunk evidence Plaintiffs claim.

Plaintiffs rely heavily on what they portray as Mathis's admission that Plaintiffs did not kidnap him:

> To get straight to the point, Mathis **specifically admitted** he was not kidnapped. The death knell to any kidnapping charge against all Plaintiffs was Mathis' admission: "I was fine with going to the bank the entire time." Because Mathis was "**fine**" with going to the Bank the "**entire time**," Mathis was never kidnapped . . .."

[25] at 13 (emphasis in original). Plaintiffs cite a portion of Mathis's interview which they say is clear evidence of their innocence. *Id.*

The Court saw Mathis's video interview too. And Mathis did say he was fine with going to the bank, but that is not all he said. Just before making that statement, Mathis told Detective Baney that he wanted to go to the bank because he "knew the breakroom and the bathroom were in a secure location" so he "could get away if [he] had to." [17-1] at 10:34:30. Mathis's statement—which Plaintiffs take wholly out of context—was not an admission, especially considering all the other times he was adamant that Bates and Powe kidnapped him. *See id.* at 11:01–11:05 (describing being taken against his will, physically assaulted, and forced to make calls and send texts); 11:12 (recounting how he did not try to escape because Powe threatened his family); 12:01–12:04 (remaining adamant that he was kidnapped and agreeing to sign affidavits stating the same). The Court is

unpersuaded by Plaintiffs' insistence that Mathis's statement negated probable cause.[5]

For these reasons, the Court finds Detective Baney and Prosecutor McDonald had probable cause to charge and prosecute Plaintiffs for conspiring to kidnap Mathis. And, because there was probable cause, Plaintiffs suffered no constitutional violation, and their Section 1983 claims fail.

### b. No Egregious or Outrageous Conduct

Setting aside probable cause, Plaintiffs' Section 1983 abuse of executive power claim cannot withstand scrutiny because Detective Baney and Prosecutor McDonald did not engage in egregious or outrageous conduct.

The Supreme Court described the legal standard for "executive abuse of power" claims like this: "[T]he substantive component of the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998) (citation modified). This is an "extremely high" standard "requiring stunning evidence of arbitrariness and caprice that extends beyond mere violations of state law, even violations resulting from bad faith to something more egregious and more extreme." *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex*

---

[5] The same reasoning defeats Plaintiffs' claim that Detective Baney lied to the municipal judge by not pointing out Mathis's statement. *See* [25] at 14. Again, Plaintiffs' interpretation of Mathis's statement cannot be squared with the rest of his interview or with the other evidence corroborating his kidnapping claim. Even if Detective Baney had told the municipal judge exactly what Mathis said, there was still adequate support for probable cause. *See Hernandez v. Terrones*, 397 F. App'x 954 (5th Cir. 2010) (disregarding improper evidence and still finding a sufficient basis to support probable cause).

*rel. Keys*, 675 F.3d 849, 868 (5th Cir. 2012) (citation modified). "[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Lewis*, 523 U.S. at 849.

In support of their abuse of executive power claim, Plaintiffs allege:

> Baney's and McDonald's conduct rose above the "conscious shocking" level, because they arranged for Plaintiffs to be charged, arrested, confined, and prosecuted without sufficient evidence and probable cause that Plaintiffs kidnapped Mathis or conspired to kidnap Mathis.

[1] ¶ 77. They say Detective Baney exhibited "conscience shocking" behavior "because a law enforcement official should never be allowed to withhold exculpatory evidence or omit key facts that weigh on whether a crime has been committed." [25] at 31.[6]

Plaintiffs do not satisfy the "shocks the conscience" standard. First, the actions Plaintiffs criticize—charging and prosecuting them for conspiring to kidnap Mathis—do not, on their own, shock the conscience. These are common law enforcement practices, and Detective Baney's and Prosecutor McDonald's jobs obligated them to perform these functions. Furthermore, Detective Baney and Prosecutor McDonald had probable cause to prosecute Plaintiffs for conspiracy, and there is no evidence they did so for any reason other than justice. *See supra* Section III.A.1.a.; *see also infra* Section III.B; *Walton v. Long*, Case No. 1:20-CV-40-SA-DAS, 2021 WL 11716216, at *1 (N.D. Miss. June 10, 2021) (granting summary judgment for police chief whose conduct did not shock the conscience). Second,

---

[6] Plaintiffs' [25] Response does not address their abuse of executive power claim against Prosecutor McDonald.

Plaintiffs offer no legal precedent finding that a law enforcement officer or a prosecutor engaged in conscience-shocking behavior simply by investigating a case and bringing charges. Instead, Plaintiffs' legal authority supports only general legal concepts or is easily distinguishable by the outrageous nature of the conduct involved. And to the extent Plaintiffs base this claim on the idea that Detective Baney lied to the municipal judge about probable cause, the Court has rejected that argument. *See supra* note 5.

For this extra reason, the Court dismisses Plaintiffs' Section 1983 abuse of executive power claim.

### 2. Qualified Immunity

Even if Plaintiffs had suffered a constitutional violation, qualified immunity shields Detective Baney and Prosecutor McDonald from Plaintiffs' Section 1983 claims. Qualified immunity shields government officials from money damages unless they (1) acted under color of state law and violated a plaintiff's constitutional right and (2) the constitutional right was clearly established. *Hodge v. Engleman*, 90 F.4th 840, 844 (5th Cir. 2024). "Crucially, a plaintiff's inability to establish an underlying constitutional violation forecloses any chance of recovery against an individual defendant who asserts qualified immunity." *Morton v. City of Corinth*, Case No. 1:22-CV-065-GHD-DAS, 2025 WL 2524853, at *3 (N.D. Miss. Sept. 2, 2025) (citing *Whitley v. Hanna*, 726 F.3d 631, 647 (5th Cir. 2013)).

The Court already determined there was no constitutional harm because Detective Baney and Prosecutor McDonald had sufficient probable cause to

prosecute Plaintiffs. So the qualified immunity inquiry could end here. *See Espinal*, 96 F.4th at 748–49 (affirming qualified immunity when the plaintiff failed to allege facts supporting a constitutional malicious prosecution claim).

To fortify the analysis, though, the Court notes that qualified immunity would protect Detective Baney and Prosecutor McDonald even if they had made a mistake about probable cause. "Even if an officer arrests someone without probable cause, qualified immunity immunizes the officer from suit unless that officer had fair notice that his conduct as unlawful." *Loftin*, 33 F.4th at 781 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). And "[f]air notice requires clearly established law." *Id.* (citation modified). Here, Plaintiffs bear the burden of providing caselaw establishing that "every reasonable official" in Detective Baney's and Prosecutor McDonald's shoes would have abandoned Plaintiffs' charges under the circumstances. *Id.* (citing *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)).

Plaintiffs have pointed to no "clearly established law" that required Detective Baney and Prosecutor McDonald to stop their prosecution just because Plaintiffs and Mathis told conflicting stories about what occurred. Instead, Plaintiffs cite *Thompson* and *Armstrong*, both of which discuss constitutional claims for malicious prosecution, but neither of which is factually analogous. *See Thompson*, 596 U.S. at 36; *Armstrong v. Ashley*, 60 F.4th 262 (5th Cir. 2023). They also cite *Green* and *Marrero*, cases that address immunity but still are not remotely similar on the facts. *Green v. Thomas*, 129 F.4th 877 (5th Cir. 2025); *Marrero v. City of Hialeah*, 625 F.2d 499 (5th Cir. 1980). These cases fall short of "clearly establishing" that

Detective Baney and Prosecutor McDonald's conduct was unconstitutional. And this is not the type of "rare" and "obvious" case where a constitutional violation is clear without relevant precedent. *See Wesby*, 538 U.S. at 64 (citation modified).

Furthermore, qualified immunity bars the Section 1983 malicious prosecution claim because there was no "clearly established right" to such a claim when Detective Baney and Prosecutor McDonald prosecuted Plaintiffs' cases. *See Santander v. Salazar*, 133 F.4th 471, 482–83 (5th Cir. 2025) (noting there was no clearly established right to a constitutional malicious prosecution claim in the Fifth Circuit until February 15, 2023). Plaintiffs were charged in January and early-February 2023, before the right to a Section 1983 malicious prosecution claim was clearly established. *See* [17-3] at 3; [17-8] at 3; [17-9] at 2, 5; [15-10] at 1.

For these reasons, qualified immunity further bars Plaintiffs' Section 1983 claims against Detective Baney and Prosecutor McDonald.[7]

### 3. No Municipal Liability

Plaintiffs' Section 1983 claims against the City fail for yet another reason. Even assuming that Detective Baney and Prosecutor McDonald unlawfully

---

[7] Prosecutor McDonald invokes prosecutorial immunity as another defense to Plaintiffs' Section 1983 claims. [18] at 16–17. Plaintiffs argue that some of Prosecutor McDonald's actions—assisting in the kidnapping investigation and making false media statements—fall outside the scope of prosecutorial immunity. [1] ¶ 63; [25] at 32–33.

Plaintiffs might be right. Prosecutorial immunity protects "conduct [that] is intimately associated with the judicial phase of the criminal process." *Loupe v. O'Bannon*, 824 F.3d 534, 539 (5th Cir. 2016). Otherwise, prosecutors only enjoy qualified immunity. *Id.* But, because Prosecutor McDonald is shielded by qualified immunity and the other defenses outlined above, the Court need not decide this issue.

prosecuted Plaintiffs for conspiracy, Plaintiffs have not alleged—much less proven—that the City can be liable for that conduct.[8]

Municipalities can be liable under Section 1983 for violating an individual's constitutional rights. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). But they cannot be liable based on respondeat superior; they must contribute to the harm. *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001). To hold the City liable under *Monell*, Plaintiffs must "identify a policymaker and identify an official city policy that was the moving force behind the alleged constitutional rights violation." *Armstrong*, 60 F.4th at 276.

There are three ways Plaintiffs can establish municipal policy for purposes of *Monell* liability: (1) they can show officially promulgated policy statements, ordinances, or regulations; (2) they can show a widespread practice so common that it fairly represents municipal policy; or (3) they can prove the "rare circumstance" where a policymaker takes a single action that violates Section 1983. *Webb v. Town of Saint Joseph*, 925 F.3d 209, 214–15 (5th Cir. 2019); *see also Armstrong*, 60 F.4th at 276.

Plaintiffs do not allege any official policy or widespread practice that led to their alleged harm. *See Webb*, 925 F.3d at 215. Instead, they speculate that the City delegated policymaking authority to Detective Baney and Prosecutor McDonald,

---

[8] To drive home a point already made, Plaintiffs suffered no constitutional harm. This wracks their Section 1983 claims against the City just like it did to their claims against Detective Baney and Prosecutor McDonald. *See Loftin*, 33 F.4th at 783 ("without a predicate constitutional violation, there can be no *Monell* liability").

and that Detective Baney and Prosecutor McDonald used that authority to violate Plaintiffs' constitutional rights. [1] ¶¶ 6–8. But they never say what the City's policy was or how that policy harmed them. *See Spiller v. City of Texas City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997) ("The description of a policy or custom and its relationship to the underlying constitutional violation, moreover, cannot be conclusory; it must contain specific facts.") Without more, Plaintiffs' sparse allegations do not state a claim for relief against the City.

Plaintiffs also allege the City failed to train Detective Baney and Prosecutor McDonald, but that allegation does not survive summary judgment either. *See* [1] ¶ 71.

A failure-to-train claim is one type of *Monell* liability. *Hutcheson v. Dallas County, Texas*, 994 F.3d 477, 482 (5th Cir. 2021). For this claim to survive, Plaintiffs must allege and prove that (1) the City failed to train or supervise Detective Baney and Prosecutor McDonald, (2) a causal link exists between the failure to train or supervise and the violation of Plaintiffs' rights, and (3) the failure to train or supervise amounts to deliberate indifference. *Id.* To show deliberate indifference, Plaintiffs must allege either "a pattern of similar constitutional violations by untrained employees" or that the "single-incident exception" applies because of the highly predictable nature of the injury. *Id.* (citation modified).

Plaintiffs have not stated a viable failure-to-train claim. They say the City was "willfully indifferent to the rights of Plaintiffs by failing to train officers that they could not cause an arrest and imprisonment of a person without reliable

evidence . . . and without disclosing complete and accurate information to the municipal judge issuing the warrants for the arrests." [1] ¶ 71. At best, this is speculation. Plaintiffs offer no factual support for what training occurred (or did not occur), what training they think should have occurred, or how any of that training might have contributed to Plaintiffs' alleged harm. Plaintiffs do not allege a pattern of similar issues, nor do they assert facts that would implicate the single-incident exception. Put simply, Plaintiffs' bare allegations do not state a claim for *Monell* liability, much less can they survive summary judgment.

Plaintiffs say they need discovery to explore whether the City trained Detective Baney and point to *Brown v. Bryan County, OK*, 219 F.3d 450 (5th Cir. 2000), for support. [25] at 37–39. But *Brown* is easily distinguishable. *Brown* was an excessive force case, where the officer involved was only 21 years old, had only been a police officer for a few weeks, had never taken any law enforcement classes, and had a history of inappropriate conduct. *Id.* at 454–55. When the department hired that officer, he had violated a term of probation and faced an outstanding arrest warrant. *Id.* Under these facts, it was "highly predictable" that the officer would use excessive force at some point, and his supervising sheriff was "on clear notice that placing him on duty with no training and no supervision could lead to an excessive force incident." *Liggins v. Duncanville, Texas*, 52 F.4th 953, 955–56 (5th Cir. 2022). The Fifth Circuit has placed *Brown* in a category of "rare and narrow scenarios." *Id.*

This case is not *Brown*. Unlike the officer in *Brown*, Detective Baney has been employed by the City for years, working in several capacities. *See* [24-12] at 3. Unlike *Brown*, no evidence suggests Detective Baney received improper training or that he had any prior performance issues. To the contrary, Detective Baney worked as his job required to investigate Plaintiffs', something he testified about during the probable cause hearing in state court. *See* [24-12]. Under these facts, quite differently from *Brown*, it was not "highly predictable" that Detective Baney might violate anyone's constitutional rights. *See Liggins*, 52 F.4th at 955–56. Without any plausible allegation that the City failed to train Detective Baney or Prosecutor McDonald, the Court declines Plaintiffs' request for discovery on this issue.

For these reasons, the Court dismisses the Section 1983 claim against the City.

B.  State Law Malicious Prosecution Claim

Plaintiffs' state law malicious prosecution claim fails for the same reason their Section 1983 claims do—Detective Baney and Prosecutor McDonald had probable cause to prosecute them for conspiring to kidnap Mathis. Even more, Plaintiffs cannot prove malice, a critical element of a malicious prosecution claim.

1.  Probable Cause

Plaintiffs' state law malicious prosecution claim is doomed because, as the Court already explained, Detective Baney and Prosecutor McDonald had sufficient probable cause to prosecute Plaintiffs for conspiracy. *See supra* Section III.A.1.a. To prove malicious prosecution under Mississippi law, Plaintiffs must demonstrate,

among other elements, "want of probable cause for the proceeding." *Univ. of Miss. Med. Ctr. v. Oliver*, 235 So. 3d 75, 83 (Miss. 2017). So, just like with Plaintiffs' Section 1983 claims, there can be no liability for malicious prosecution if probable cause existed. *Coleman v. Smith*, 914 So. 2d 807, 812 (Miss. Ct. App. 2005) ("A claim for malicious prosecution fails when probable cause existed for the defendant to institute criminal proceedings.") Because probable cause existed, Plaintiffs' state law malicious prosecution claim is legally insufficient.

### 2. No Malice

Plaintiffs' state law malicious prosecution claim is deficient for another reason too—Plaintiffs cannot prove Detective Baney and Prosecutor McDonald acted with malice in prosecuting them for Mathis's kidnapping.

To prove malicious prosecution under Mississippi law, Plaintiffs must demonstrate Detective Baney and Prosecutor McDonald acted with "malice in instituting the proceeding" *Univ. of Miss. Med. Ctr.*, 235 So. 3d at 83. Malice, for purposes of malicious prosecution, "connotes a prosecution instituted primarily for a purpose other than that of bringing an offender to justice. As such, it refers to the defendant's objective, not his attitude." *Id.* at 83 (citation modified). So, here, Plaintiffs must prove that Detective Baney and Prosecutor McDonald instituted criminal proceedings "with a purpose other than doing [their] job[s]." *Id.* In the words of the Mississippi Supreme Court, "this is a high bar." *Id.* Plaintiffs have not met that bar.

Nothing in the record suggests Detective Baney and Prosecutor McDonald acted with any purpose other than doing their jobs. To the contrary, Detective Baney thoroughly investigated Mathis's kidnapping claim. *See supra* Section III.A.1.a.(summarizing evidence discovered during the investigation); [24-12] (Detective Baney testifying about investigative efforts). And, as Plaintiffs point out, Detective Baney directly challenged Mathis's version of the events during Mathis's interview. *See* [25] at 18; [17-1] at 10:54–11:22. Even more, Detective Baney and Prosecutor McDonald took part in a probable cause hearing in Madison County Municipal Court where Prosecutor McDonald questioned Detective Baney at length about his probable cause for prosecuting Plaintiffs' cases. *See* [24-12]. This evidence makes untenable any suggestion that Detective Baney or Prosecutor McDonald acted with malice. Plaintiffs' unsupported malice allegations are not enough to survive summary judgment. *See Dowdy v. Grayson*, 416 So. 3d 132, 140 (Miss. Ct. App. 2025) (noting that "speculative inferences alone" could not prove malice); *Miles v. Paul Moak of Ridgeland, Inc.*, 113 So. 3d 580, 586 (Miss. Ct. App. 2012) (affirming summary judgment on malicious prosecution claim where plaintiffs failed to prove malice).

The Court dismisses Plaintiffs' state law malicious prosecution claim.

IV.   Conclusion

For the reasons above, the Court grants the [17] Motion, denies as moot the [15] Motion, and dismisses all claims with prejudice. In doing so, the Court has considered all the parties' arguments. Any arguments the Court did not address

would not have altered its decision. The Court will enter a separate final judgment consistent with this Order.

SO ORDERED, this 23rd day of December, 2025.

s/ *Kristi H. Johnson*
UNITED STATES DISTRICT JUDGE